IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT K. LEE,                          :
                                        :
        Plaintiff,                      :
                                        :
v.                                      :        CIVIL ACTION 08-0472-M
                                        :
MICHAEL J. ASTRUE,                      :
Commissioner of                         :
Social Security,                        :
                                        :
        Defendant.                      :


<u>MEMORANDUM OPINION AND ORDER</u>


        In this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),
Plaintiff seeks judicial review of an adverse social security
ruling which denied claims for disability insurance benefits and
Supplemental Security Income (hereinafter *SSI*) (Docs. 1, 13).
The parties filed written consent and this action has been
referred to the undersigned Magistrate Judge to conduct all
proceedings and order the entry of judgment in accordance with 28
U.S.C. § 636(c) and Fed.R.Civ.P. 73 (*see* Doc. 20).  Oral argument
was waived in this action (Doc. 19).  Upon consideration of the
administrative record and the memoranda of the parties, it is
**ORDERED** that the decision of the Commissioner be **AFFIRMED** and
that this action be **DISMISSED**.

        This Court is not free to reweigh the evidence or substitute
its judgment for that of the Secretary of Health and Human Ser-

vices, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), which must be supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence test requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

At the time of the most recent administrative hearing, Plaintiff was forty-three years old, had completed a one-year college education, and had previous work experience as an equipment operator and construction supervisor (Doc. 14). In claiming benefits, Plaintiff alleges disability due to severe muscle spasms in his upper body as well as generalized pain, degenerative disc disease with resulting pain, and spasmodic torticollis (Doc. 14).

The Plaintiff filed protective applications for disability benefits and SSI on May 11, 2001 and June 21, 2001, respectively, asserting an onset date of January 1, 2001 (Tr. 54-57, 448-52; *see* Tr. 481). Benefits were denied following a hearing by an Administrative Law Judge (ALJ) who determined that Lee had failed to prove a disability that lasted for twelve continuous months (Tr. 14-20). Plaintiff challenged that decision in this Court which determined that his claims had not been properly

considered; the decision was reversed and the action was remanded for further administrative procedures (Tr. 519-27). *Lee v. Barnhart*, Civil Action 04-0765-C (S.D. Ala. September 23, 2005).

Following remand and a supplemental hearing, benefits were again denied by the same ALJ who this time determined that although Lee could not perform any of his past relevant work, he was able to perform light, unskilled work existing in the national economy (Tr. 478-501). Plaintiff requested review of the hearing decision (Tr. 475-76) by the Appeals Council, but it was denied (Tr. 472-74).

Plaintiff brought the action back to this Court and now claims that the opinion of the ALJ is not supported by substantial evidence. Specifically, Lee alleges the following: (1) The ALJ did not properly consider the opinions and conclusions of his treating physicians; (2) the ALJ did not properly consider his claims of pain; and (3) the ALJ did not allow Plaintiff's attorney to question the vocational expert (hereinafter *VE*) at the evidentiary hearing (Doc. 13). Defendant has responded to—and denies—these claims (Doc. 15). The relevant medical evidence follows.[1]

Treatment notes from Dr. R. Lee Irvin at Anesthesia & Pain

---

[1] Plaintiff has asserted an onset date of January 1, 2001 (Tr. 54-57, 448-52; *see* Tr. 481), so the Court will, only in the briefest form, summarize the medical evidence before that date. Furthermore, the Court will not include transcript evidence which is not directly relevant to the claims brought in this action.

Management indicate that from July 3, 1997 through May 9, 2000
Plaintiff received medication, trigger point injections, and a
multilevel cervical facet joint block (Tr. 399-420).  This
treatment came after an initial work injury in 1988, followed by
surgery and conservative treatment.

On January 8, 2001, Dr. Charles E. Hall, Jr., who
specialized in physical medicine and rehabilitation, noted that
Lee was in moderate distress as he seemed to be in a lot of pain
(Tr. 271, 281).  Plaintiff had limited cervical range of motion
(hereinafter *ROM*), significant spasms in the paravertebral
cervical area, and trigger points in his left side cervical
paraspinal areas and lower back.  His muscle exam remained
stable, though, and he had no upper motor neuron signs in his
upper extremities.  Hall continued the prescriptions for
Oxycontin[2] and Trazodone[3] and gave Lee a Toradol[4] injection for
acute pain relief.  On February 21, Hall noted that Plaintiff was
in no apparent distress though he was unchanged, neurologically,
in the upper extremities (Tr. 270).  A month later, Lee

---

[2]"*OxyContin* tablets are a controlled-release oral formulation of
oxycodone hydrochloride indicated for the management of moderate to
severe pain where use of an opioid analgesic is appropriate for more
than a few days." *Physician's Desk Reference* 2344-46 (52nd ed. 1998).

[3]*Trazodone* is used for the treatment of depression. *Physician's
Desk Reference* 518 (52nd ed. 1998).

[4]*Toradol* is prescribed for short term (five days or less)
"management of moderately severe acute pain that requires analgesia at
the opioid level." *Physician's Desk Reference* 2507-10 (52nd ed. 1998).

complained of spasms in his neck and right shoulder; Hall noted trace weakness in his right hand grip, but no obvious edema or erythema in the upper extremities.  Cervical ROM was stable.  On April 12, the doctor noted no upper neuron signs in spite of spasms on the right side of Lee's face (Tr. 268).  On May 7, Hall noted that Plaintiff was not having spasms but that the ROM in his right shoulder was decreased due to pain; Lee never had full flexion (Tr. 267).

An MRI, performed on May 8, 2001, showed the following: degenerative disc disease in the lower cervical spine with mild disc bulge at C5-6 with associated spondylosis; hypertrophic changes unconvertebral joints with right foraminal stenosis at C3-4 and bilateral foraminal stenosis at C4-5 and C5-6; and mild cervical spinal stenosis (Tr. 232).  The next day, Dr. Hall noted that Plaintiff was in no distress and was neurologically unchanged from the last exam (Tr. 266).

On June 1, 2001, Dr. John G. Yager, Neurologist, examined Lee and noted "almost full range of motion of the neck" though there were complaints of discomfort (Tr. 249-50, 284).  Plaintiff reported "decreased sensation in a median distribution on the right side" (Tr. 250).  Motor strength was 5/5; he had limited range of motion of the right shoulder, unable to raise it above horizontal.  Lee favored the right leg when walking.  Yager

prescribed Tranxene[5] and Neurontin.[6]  A week later, an EMG and motor nerve conduction study of the right median and right ulnar motor nerves was normal (Tr. 253-57).

A medication list, provided by Family Discount Drugs, demonstrates that, from November 1996 through June 2001, Lee was regularly prescribed a diet of Oxycontin, Oxycodone,[7] Clorazepate,[8] Neurontin, Trazodone, Celebrex,[9] Hydrocodone,[10]

---

[5]*Tranxene* is used in the management of anxiety disorders or for the short-term relief of the symptoms of anxiety.  *Physician's Desk Reference* 2450-52 (62nd ed. 2008).

[6]*Neurontin* is used in the treatment of partial seizures. *Physician's Desk Reference* 2110-13 (52nd ed. 1998).

[7]*Oxycodone* is a pure agonist opioid whose principal therapeutic action is analgesia. *Physician's Desk Reference* 2680-81 (62nd ed. 2008).

[8]*Clorazepate*, also known as *Tranxene*, is used in the management of anxiety disorders or for the short-term relief of the symptoms of anxiety.  *Physician's Desk Reference* 2450-52 (62nd ed. 2008).

[9]*Celebrex* is used to relieve the signs and symptoms of osteoarthritis, rheumatoid arthritis in adults, and for the management of acute pain in adults.  *Physician's Desk Reference* 2585-89 (58th ed. 2004).

[10]*Hydrocodone* is used "for the relief of moderate to moderately severe pain."  *Physician's Desk Reference* 2926-27 (52nd ed. 1998).

Skelaxin,[11] Zanaflax,[12] Carisoprodol,[13] Relafen,[14] Ambien,[15] Soma,[16] Lortab,[17] and Darvocet[18] (Tr. 233-46).

On August 28, Dr. Hall noted that Plaintiff was in moderate distress though his reflexes were equal and the remainder of motor testing revealed no gross focal motor deficits (Tr. 265).

On September 11, 2001, Dr. Eyston A. Hunte performed a consultative physical examination and noted a 50-60% reduction in cervical spine ROM; there was also tenderness to palpation over

---

[11]*Skelaxin* is used "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions." *Physician's Desk Reference* 830 (52nd ed. 1998).

[12]*Zanaflax* "is a short-acting drug for the acute and intermittent management of increased muscle tone associated with spasticity." *Physician's Desk Reference* 3204 (52nd ed. 1998).

[13]*Carisoprodol* is a muscle relaxer used "for the relief of discomfort associated with acute, painful musculoskeletal conditions." *Physician's Desk Reference* 3160 (54th ed. 2000).

[14]*Relafen* "is indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis." *Physician's Desk Reference* 2859 (52nd ed. 1998).

[15]*Ambien* is a class IV narcotic "indicated for the short-term treatment of insomnia." *Physician's Desk Reference* 2884 (54th ed. 2000).

[16]*Soma* is a muscle relaxer used "for the relief of discomfort associated with acute, painful musculoskeletal conditions," the effects of which last four-to-six hours. *Physician's Desk Reference* 2968 (52nd ed. 1998).

[17]*Lortab* is a semisynthetic narcotic analgesic used for "the relief of moderate to moderately severe pain." *Physician's Desk Reference* 2926-27 (52nd ed. 1998).

[18]Propoxyphene napsylate, more commonly known as Darvocet, is a class four narcotic used "for the relief of mild to moderate pain" and commonly causes dizziness and sedation. *Physician's Desk Reference* 1443-44 (52nd ed. 1998).

the posterior cervical spine and right shoulder muscles (Tr. 259-63).  The doctor noted some difficulty with manipulation on the right; grip strength was forty pounds on the right and sixty pounds on the left.  There was decreased muscle strength on both the left and right, but was more pronounced on the right; Plaintiff complained of neck and shoulder pain when his muscles were tested.  Plaintiff had decreased abduction and forward elevation ROM in the right shoulder (90 of 150 degrees); all other ROM tests throughout his body were normal.  Lee walked with a slight limp and declined to toe walk because of right leg weakness.

On October 2, Dr. Hall noted that Plaintiff was in no acute distress and that his cervical ROM was within functional limits for both flexion and extension (Tr. 264).  There were no other focal motor deficits though there was pain in the right shoulder and "[p]ain with palpation of his acromioclavicular joint as well as along the supraspinatus insertion area" (Tr. 264).  The doctor prescribed OxyContin and said he would send Lee to a specialist and inquire about a pain pump as he had "really [] exhausted all [his] resources" (Tr. 264).

On January 2, 2002, Dr. Yager noted that Lee's extremities showed no focal atrophy or contractures though he could not raise his right arm to horizontal (Tr. 285-87).  Plaintiff could heel,

toe, and tandem walk.  Yager noted that Lee was taking Xanax[19] but was going to start him on Zanaflex.

On January 5, Plaintiff went to the University of South Alabama Medical Center (hereinafter *USAMC*) for multiple episodes of tortopelvic spasms, torticollic spasms and back arching for which he was given Benadryl (Tr. 294-97).  An x-ray of the chest showed no acute cardiopulmonary disease.

On February 18, Dr. Hall noted that Plaintiff appeared to be in no distress; examination of the upper extremities revealed no obvious edema or erythema (Tr. 291).  Reflexes were equal and there was no gross motor deficits.  A form, completed a month later by Hall, indicated that Lee's pain was distracting to adequate performance of daily activities, that physical activity greatly increased his pain and would distract him from his task or cause him to abandon it altogether, and that Plaintiff's prescribed medications would limit him some, but not seriously (Tr. 292-93).[20]

On May 22, 2002, Dr. Yager wrote a letter to Dr. Hall stating that Lee, on examination, had limited ROM "trying to bend his head to the right" though he does better on the left (Tr. 438; *see generally* Tr. 438-39).  Plaintiff also had limited ROM

---

[19]*Xanax* is a class four narcotic used for the management of anxiety disorders.  *Physician's Desk Reference* 2294 (52nd ed. 1998).

[20]Dr. Hall completed the form again on June 26, 2002, restating the same opinions as earlier (Tr. 434-35).

when holding his right arm over his shoulder, though there was no muscle atrophy; he had normal tone.  There was "no hypertrophy of the sternocleidomastoid muscles or other musculature often seen in torticollis" (Tr. 439).  Yager continued the Zanaflex and placed him on Vistaril to go with the Ultram,[21] "in attempting to get him off his OxyContin" (Tr. 439).

Records from Springhill Memorial Hospital (hereinafter *SMH*) show that Plaintiff was admitted for six nights in June 2002 for seizure-like activity (Tr. 299-302, 424-32).  An EEG, however, showed no seizure activity.  An "MRI of the cervical spine []" showed intra vertebral neuro foramen narrowing that [was] moderate at C3-4 [and] at C4-5.  There [was] a disk bulge at C5-6 and a narrowing of the neuro foramen on the right at C6-7" (Tr. 299).  Plaintiff was given Xanax and Haldol.  It was suggested that Lee might need psychiatric help.

On July 26, Dr. William A. Crotwell, III, an Orthopedic Surgeon, performed a consultative physical examination and noted that Lee had decreased sensory in the right arm from the elbow down; his grip strength was normal (Tr. 303-06).  ROM was as follows:  "70 flexion, 50 extension, lateral motion 50 right and left" (Tr. 304).  Crotwell noted "good muscle tone and muscle structure in the upper extremity bilateral" (*id.*).  It was the

---

[21]*Ultram* is an analgesic "indicated for the management of moderate to moderately severe pain."  *Physician's Desk Reference* 2218 (54th ed. 2000).

Orthopedist's opinion that Plaintiff "could carry out light and could definitely carry out sedentary work" (*id.*).  A physical capacities evaluation (hereinafter *PCE*) was completed in which Crotwell indicated that Lee could sit, stand, and walk for one hour, each, at a time and sit eight, stand six, and walk for four hours during an eight-hour day (Tr. 305).  The doctor further found that Plaintiff could lift ten pounds continuously, twenty-five pounds frequently, and fifty pounds occasionally and could carry five pounds continuously, twenty pounds frequently, and twenty-five pounds occasionally.  Crotwell indicated that Lee was capable of simple grasping and fine manipulation and pushing and pulling of arm and leg controls; he found that Plaintiff could bend, squat, crawl, and climb occasionally and could frequently reach.  The Orthopedist said that Lee should be totally restricted from being at unprotected heights, moderately restricted in being around moving machinery, and only mildly limited in driving automotive equipment.

On September 16, 2002, Dr. Todd D. Elmore, a Neurologist, examined Plaintiff and found him to be in no acute distress (Tr. 307-10).  Plaintiff's strength was 5/5 throughout, although he gave "somewhat poor effort with some inconsistent weakness;" his reflexes were 2/4 and symmetric (Tr. 308).  Gait and station were normal.  Dr. Elmore's impression was cervical and lumbar radiculopathies, chronic pain syndrome, neck spasms, and chronic

narcotic use; he further noted the following, however:  "All of the patient's complaints are subjective in nature.  He has no objective abnormalities on exam other than the scars consistent with his history of surgery" (Tr. 309).  The Neurologist completed a PCE in which he indicated that Plaintiff could sit six, stand four, and walk four hours at a time but could sit eight, stand five, and walk four hours during an eight-hour day; the doctor opined that Lee could lift and carry ten pounds continuously, twenty-five pounds frequently, and fifty pounds occasionally (Tr. 310).  Elmore stated that Plaintiff would have no problems with grasping, fine manipulation, or arm or leg controls; he could also bend, squat, crawl, climb, and reach occasionally.

On September 18, 2002, Plaintiff went to SMH for Oxycontin withdrawal (Tr. 330-39).  It was noted that his neck ROM was limited secondary to pain but that he had full ROM in all extremities (Tr. 334).  An EKG was normal.

On October 9, Neurologist Yager examined Plaintiff and noted decreased ROM in the right shoulder and that he would not lift it past horizontal due to the pain (Tr. 437).  The doctor further noted that Lee "twists to either side pretty good though, and bends to either side with his hands fairly well" (*id.*)  There was decreased sensation in the index and long finger of his right hand; gait was normal.  Yager said that he did not think surgery

was necessary as the EMG studies had been normal.

Records spanning June 28, 2002 through December 18, 2002 show that Plaintiff received treatment at Mobile Mental Health West for an Adjustment Disorder with Mixed Anxiety and a Depressed Mood (Tr. 343-67).

On October 23, 2003, Dr. Yager noted that Lee was about the same and that he had been receiving Botox injections for his torticollis (Tr. 611).  Plaintiff's "neck actually ha[d] a fairly good range of motion" (Tr. 611).  Though Lee complained of pain in putting his hands over his head, he had no trouble bending over and touching his toes.  He could squat and rise and had normal gait.  Yager prescribed Lortab.  On April 15, 2004, Plaintiff had full ROM in his neck; his extremities had no atrophy or contractures (Tr. 610).  Sensation was normal and symmetric.  The doctor prescribed Lortab and Ultracet.[22]  On March 7, 2005, Plaintiff continued to complain of neck pain, radiating down his right shoulder and into his arm; Dr. Yager noted that Lee was not doing his neck exercises (Tr. 609).  On examination, the Neurologist noted that his neck was supple and that he had limited neck ROM in all directions, particularly with bending to the left.  Plaintiff could lift his hands over his head, though he complained of shoulder pain.  There was no

_____

[22]*Ultracet* is made up of acetaminophen and tramadol and is used for the short-term (5 days or less) management of pain.  *See* http://health.yahoo.com/drug/d04766A1#d04766a1-whatis

musculature wasting; gait was normal.  He could bend at the hips and touch his toes; twisting at the hip was not a problem; he could bend to the side quite well.  Lee's "only limited ROM [was] in the neck" (Tr. 609).  Yager noted that there was no evidence for torticollis, but his musculature was a little tight.

On March 16, 2005, Mobile Infirmary performed roentological services which demonstrated anterior degenerative osteophyte formation at C4-5 and C5-6 (Tr. 604-06).

On July 18, 2005, Lee was treated at USAMC for abdominal pain and diarrhea (Tr. 580-91).

On January 11, 2006, Dr. Yager noted "decreased neck ROM in all directions but fairly mobile actually.  He cannot quite get his hands over his head and touch his palms together, and his right shoulder hurts.  It hurts to put his right hand behind his back but the left is OK" (Tr. 608).  Plaintiff could bend over and touch his toes; he ambulated with a slow gait but no limp.  The doctor started him on Indocin,[23] in addition to his other medications:  Zanaflex, Haldol, Xanax, Vistaril, and Lortab.

On June 23, 2006, Plaintiff underwent an MRI of the cervical spine at USAMC which showed mild-to-moderate degenerative changes, including a prominent disco-osteophytic right lateral

---

[23]*Indocin* is a non-steroidal drug found to be effective in the treatment of moderate to severe rheumatoid arthritis, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder (bursitis and/or tendinitis), and acute gouty arthritis.  *Physician's Desk Reference* 1676 (52nd ed. 1998).

and bulge at C-3 and probably partial fusion of C6 and C7 vertebral bodies (Tr. 578).

During the months of June and July 2006, Plaintiff was seen at Stanton Road Clinic for complaints of muscle spasms, loss of sensation, and back pain (Tr. 597-603).  An x-ray showed degenerative disc disease at multiple levels with narrowing of the disc space seen at C6-7 (Tr. 601).  Lee was treated for quadraparesis, polyneuropathy, and spasms.

On September 19, 2006, Orthopedic Surgeon Crotwell again examined Lee and noted that he was "sitting, bending his knees and moving his legs without a lot of difficulty" (Tr. 593; *see generally* Tr. 592-96).  In the "upper extremity he could flex 90 percent with the cervical spine, extend 90, lateral motion 90. Reflexes are +2 in the biceps, triceps and brachioradialis. Sensory was generalized really nonspecific and would vary after repeating the same area in both arms" (Tr. 593).  Motor was 5/5 and gait was normal.  Plaintiff had "a very cut or toned upper extremity" (Tr. 593).  Heel and toe walk were normal.  In the lower extremities, "[s]ensory again has vague generalized decrease over both lower legs, over the lateral calves and then over the dorsum of the feet, and then it would vary back and forth" (Tr. 593).  "Lying, straight leg raise 90 degrees right and left with increased pain with plantar flexion and no change with dorsiflex, which again is inconsistent" (Tr. 593-94).  Lee

had "buff muscular lower extremities" (Tr. 594).   The doctor
stated the following:

> Of note, when the patient was in the
> room trying to examine him and walking out,
> he shuffled and would walk very, very slow
> and all holding on to his wife.  We observed
> the patient leaving our building.  He was
> able to walk with no difficulty without
> assistance, he was able to get into the car
> without assistance, without any problems.
> This was documented by myself and the nurse
> that was with me.

(Tr. 594).  In conclusion, Dr. Crotwell found very little wrong
with Lee, orthopedically, and expressed the opinion that he had
engaged in self-limiting behavior and was borderline malingering;
he further stated that Plaintiff could definitely carry out
sedentary work, but could probably do medium work.

On October 25, 2006, Dr. Yager noted that Lee walked with a
narrow base and could heel and toe-walk (Tr. 607).

On December 20, 2006, Plaintiff was treated for dizziness,
from his medications, at USAMC (Tr. 612).

On April 17, 2007, Neurologist Yager examined Lee and noted
that he had "osteoarthritis of his neck but has never really had
any definite radiculopathy" (Tr. 613; see generally Tr. 613-18).
The doctor noted limited neck ROM in all directions and limited
ROM off his arms, being unable to lift his arms over his head.
Strength was 5/5 in all muscle groups; bulk and tone were normal.
Plaintiff could heel and toe walk and bend over and touch his

16

toes; he could squat and rise.  Lee could twist for bend to either side, but not with full ROM.  It was Yager's opinion that Plaintiff was "capable of work-related activities but he [would] have some limitation of lifting/carrying secondary to his cervical strain" (Tr. 614).  The Neurologist completed a PCE in which he indicated that Plaintiff could stand and walk for an hour at a time and up to four hours during an eight-hour day; there were no limits on his ability to sit (Tr. 615-17).  Plaintiff was capable of lifting ten pounds constantly, twenty-five pounds frequently, and fifty pounds occasionally while able to carry ten pounds constantly, twenty pounds frequently, and forty pounds occasionally.  Yager thought that Lee could climb only occasionally, but could balance, stoop, kneel, crouch, crawl, reach overhead, and use arm controls for pushing and pulling on a frequent basis.  The doctor indicated that he should never work in high places or drive automotive equipment.

On May 8, 2007, Lee was seen by Dr. Terry J. Millette, Neurologist, who noted diminished neck ROM with "a moderate degree of muscle spasm in the suboccipital trapezius muscle more so than the supraclavicular trapezius muscle" (Tr. 619; see generally Tr. 619-20).  He noted that Plaintiff walked with a prosthesis.  Sensory motor examination was intact.  Dr. Millette's impression was chronic spinal spondylosis and chronic opioid dependency.  On July 25, the Neurologist completed a PCE

17

in which he indicated that Lee had impairments which would produce pain which would keep him from working a normal forty-hour work-week; he also stated that Plaintiff may need to rest during a normal workday (Tr. 621-22). He further stated that Plaintiff could sit one hour and stand/walk one hour at a time and could sit for four hours and stand/walk four hours during an eight-hour day. The doctor thought that Plaintiff could lift and carry up to ten pounds frequently and twenty pounds occasionally. Lee would have no problems with simple grasping, pushing and pulling of arm controls, and fine manipulation. The Neurologist indicated that Lee was severely limited in driving an automobile or forklift and would be moderately limited in working at unprotected heights, bending at the waist, and stooping. Plaintiff would be able to push and pull leg controls, though it would increase his lumbar pain. Dr. Millette said that Lee's subjective complaints were consistent with his clinical findings and expressed the opinion that he could perform, at most, sedentary work.

At the most recent evidentiary hearing, on August 14, 2007, Plaintiff testified that he did not drive on the advice of his doctors because of the medications that he takes (Tr. 636-56). Lee stated that he has nerve damage in his right arm which caused it to jerk and that he has facial twitching; he suffers pain in his right arm, neck, legs, and hips. Plaintiff testified that he

18

could only pick up small things, that he could not pick up his eighty-four pound son; he stated that he had a right leg limp and that he gets dizzy from his medications, causing him to stumble. His medications also cause short-term memory loss and sleepiness. Lee stated that he lies around most of the time because he cannot do anything else.

The VE testified about the work that Plaintiff had previously performed (Tr. 656-66). In response to a hypothetical question asked by the ALJ, based on examinations and PCE's completed by Drs. Crotwell and Yager (*cf.* Tr. 592-96, 613-18), the VE stated that the hypothetical person could perform specified light work as an assembler, garment bagger, and cafeteria attendant. Plaintiff's attorney asked the VE about Lee's ability to work based on Dr. Hall's pain assessment; the VE responded that all work would be precluded; the VE also stated that if Plaintiff had to rest, recline, or lie down during the course of a work day, he would be precluded from working. Upon further questioning by the ALJ, the VE stated that if pain medication worked and did not cause limitations, then it would not preclude work.

The ALJ summarized the evidence of record and determined that Lee was capable of performing light, unskilled work existing in the national economy (Tr. 478-501). In reaching this decision, the ALJ noted te absence of any medical notes from the

19

end of 2002 through October 2003 (Tr. 488).  The ALJ determined
that Plaintiff had no severe mental impairment (Tr. 493), a
finding unchallenged by Lee in this action.  The ALJ also
"assigned determinative evidentiary weight to the findings and
opinions of the claimant's treating neurologist, Dr. Yager, as
well as to those of the examining orthopedic surgeon, Dr.
Crotwell" (Tr. 494).  The ALJ assigned insignificant weight to
the conclusions and opinions of Drs. Hall and Millette; he also
found that Lee's testimony of his pain and limitations was not
credible (Tr. 496-99).

Before proceeding directly to Lee's claims, the Court notes
that he has raised his first two claims together as a claim that
the ALJ did not properly consider his claims of pain.  The Court
will, herein, set out the pain standard and then take up the
claim individually.

The standard by which the Plaintiff's complaints of pain are
to be evaluated requires "(1) evidence of an underlying medical
condition and either (2) objective medical evidence that confirms
the severity of the alleged pain arising from that condition or
(3) that the objectively determined medical condition is of such
a severity that it can be reasonably expected to give rise to the
alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.
1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir.
1986)).  The Eleventh Circuit Court of Appeals has also held that

the determination of whether objective medical impairments could reasonably be expected to produce the pain was a factual question to be made by the Secretary and, therefore, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." *Hand v. Heckler*, 761 F.2d 1545, 1549 (11th Cir.), *vacated for rehearing en banc*, 774 F.2d 428 (1985), *reinstated sub nom. Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). Furthermore, the Social Security regulations specifically state the following:

> statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R.. 404.1529(a) (2008).

Plaintiff's first claim is that the ALJ did not accord proper legal weight to the opinions, diagnoses and medical evidence of Plaintiff's physicians. Lee specifically refers to the conclusions of Drs. Hall and Millette (Doc. 13, pp. 9-13). It should be noted that "although the opinion of an examining physician is generally entitled to more weight than the opinion

21

of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981);[24] *see also* 20 C.F.R. § 404.1527 (2008).

As noted earlier, the ALJ credited Drs. Yager and Crotwell in making his determination (Tr. 494). Dr. Yager has been Lee's treating Neurologist since June 1, 2001 (Tr. 249-50, 284); Yager found Plaintiff capable of performing light work in spite of his pain (Tr. 615-17; *cf.* 20 C.F.R. § 404.1567(b)).[25] Dr. Crotwell is an Orthopedic surgeon who has examined Lee on two different occasions and indicated that there is nothing major wrong with Lee orthopedically; he also indicated that Plaintiff was capable of light—if not medium—work (Tr. 303-06, 592-96). Crotwell also indicated that Lee was engaged in self-limiting behavior and was borderline malingering.

In reviewing Dr. Hall's records, the Court finds substantial

---

[24]The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[25]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

support for the ALJ's opinion that Hall's conclusions are not
supported by the evidence of record; to a large extent, they are
not even supported by his own notes.  Specifically, Plaintiff was
in no apparent distress on several occasions during the sixteen
months[26] he treated Plaintiff:  February 21, 2001 (Tr. 270), May
9, 2001 (Tr. 266), and February 18, 2002 (Tr. 291).  On October
2, he found Plaintiff to be in no acute distress and that his
cervical ROM was within functional limits for both flexion and
extension (Tr. 264).  In spite of this, Dr. Hall indicated that
Plaintiff's pain was so severe that he would be unable to work
(*see* Tr. 292-93, 434-35).

The record shows that Dr. Millette had seen Lee one time[27]
after determining that Plaintiff's pain would keep him from
working (Tr. 619-22).  His determination came, two-and-one-half
months after the one-time examination which states only that
Plaintiff had "diminished range of motion of the neck," "a
moderate degree of muscle spasm," and "walks with a prosthesis"
(Tr. 619-22).

The Court finds that the opinions of Drs. Hall and Millette
do not stand up to the record evidence.  Dr. Yager's long-

---

[26]"From January 2001 until April 2002 the Plaintiff was treated by
Dr. Charles Hall" (Doc. 13, p. 5).

[27]Though Millette's note indicated that he had seen him in the
"distant past," there is nothing else in the record to support the
assertion (Tr. 619).  Even Plaintiff's Attorney noted that Dr.
Millette began treating Lee on May 8, 2007 (Doc. 13, p. 7).

standing treatment and conclusion that Plaintiff can perform light work, along with Dr. Crotwell's two thorough examinations, provide ample support for the ALJ's conclusion that the extreme limitations voiced by Drs. Hall and Millette are to be discounted. Lee's claim otherwise is without merit.

Plaintiff has also claimed that the ALJ did not properly consider his complaints of pain (Doc. 13, pp. 7-8). The Court notes that the ALJ rejected Lee's claims of extreme limitation and pain (Tr. 497-99). In reaching this decision, the ALJ noted that the record did not demonstrate that he had complained to his physicians about the side effects of his medications. The ALJ also noted that Dr. Crotwell and Psychologist McCleary had indicated that Plaintiff appeared to be malingering. The Court would add that Dr. Yager's treatment notes fail to support the degree of limitation and pain asserted. Plaintiff's claim is without merit.

Lee's final claim is that the ALJ did not allow Plaintiff's attorney to question the VE at the evidentiary hearing. More specifically, Lee objects to the ALJ's not allowing his Attorney to pursue two lines of questioning: the first had to do with Plaintiff's taking daily naps as a side effect of his medication, Xanax, while the second concerned some medical documents provided by Dr. Millette that had not yet made it into the record (Doc. 13, pp. 13-17).

As to the first line of questioning, the ALJ noted the absence of complaints in the medical records regarding the side effects of the medications being taken (Tr. 499).  While Lee might have experienced side effects from the multiple drugs he was taking, he only rarely made that known to his doctors.  That failure cannot be discounted.

As to the ALJ's refusal to let Plaintiff's Attorney question the VE regarding documents that were not in the record, it might have been more appropriate for the ALJ to recess the hearing or allow the Attorney to submit interrogatories regarding the documents once the snafu was resolved.  Nevertheless, the Court has found that the ALJ's rejection of those reports was a decision supported by substantial record evidence.  Having reached that decision, the Court finds that the ALJ's actions in this regard amount to, at most, harmless error.  This claim has no merit.

The Court is well aware that Plaintiff has suffered over the years and has taken multiple medications to alleviate his suffering.  However, Dr. Yager, who has seen Lee the most and for the longest period of time, finds that Plaintiff is capable of working.  In this record, Dr. Yager provides the best evidence of Lee's impairments and abilities.

Plaintiff has raised three claims in bringing this action. All are without merit.  Upon consideration of the entire record,

the Court finds "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401.   Therefore, it is **ORDERED** that the Secretary's decision be **AFFIRMED**, *see Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980), and that this action be **DISMISSED**.   Judgment will be entered by separate Order.

DONE this 19th day of May, 2009.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE